## RISMILLER v GREWE et

Ohio Appeals, 2nd Dist, Darke Co

No 550. Decided May 5, 1939

Wilbur D. Spidel, Greenville; Richard E. Hole, Greenville, for plaintiff-appellee.

T. A. Billingsley, Greenville; Orel J. Myers, Dayton, for defendants-appellants.

### OPINION

By BARNES, J.

The above entitled cause is now being determined de novo by reason of an appeal on questions of law and fact from the final judgment of the Court of Common Pleas of Darke County, Ohio.

The action originated in the Common Pleas Court as a partition suit.

Robert W. Grewe filed an answer and cross-petition wherein he claimed to have title to an 80 acre farm described in the petition and prayed that his title thereto be quieted.

The Common Pleas Court held against defendant Robert W. Grewe, and ordered partition as prayed for in plaintiff's petition.

Motion for new trial was filed, overruled and judgment entered in accordance with the trial court's written opinion.

As heretofore stated, the cause comes to our court for hearing de novo.

Counsel for the respective parties by an agreed entry, are submitting the cause upon the transcript of evidence presented before the trial court.

The plaintiff in her action for partition claimed title to an undivided interest in the 80 acre farm in question, as well as other premises, by reason of inheritance.

Appellant claims title by reason of a warranty deed, duly executed by William H. F. Grewe, and claimed to be deposited in escrow to be held until the death of the grantor.

The deed is regular upon its face, properly signed and witnessed and acknowledged.

The sole and only question presented is whether or not there was a delivery in escrow.

The deed purports to be signed on the 10th day of December, 1926, and there seems to be no question that this was the date of its execution.

The deed is introduced in evidence as Defendant's Exhibit 1-A. The deed was executed before George A. Katzenberger, who acted as the scrivener and took the acknowledgment. Mr. Katzenberger is an attorney of the Darke County Bar.

Also introduced in evidence as Defendant's Exhibit 1, is an envelope, large enough to place the deed therein when folded in the usual manner. This envelope from the printing apparently was a stock envelope of the Newark Fire Insurance Company, and had printed thereon "George A. Katzenberger, Agent, Greenville, Ohio." In typewriting on the outside of the envelope was the following: "Deed from William H. F. Grewe to his nephew, Robert W. Grewe to be delivered to Robert W. Grewe after death of William H. F. Grewe, grantor herein."

Mr. Katzenberger was called as a witness in the case and gave testimony. It is apparent that he does not have an independent recollection of the transaction, but he identifies the deed and the envelope with the endorsement thereon. He also says that he gave directions to William H. F. Grewe as to what was required in the way of delivery. As to whether or not the deed was left with him for a time he does not remember.

Mrs. Sophia Mohrfield, was called as a witness. She is referred to throughout the record as "Auntie". More than thirty years previous she had been married and lived in another state. After the death of her husband she returned to Ohio and at once went to the home of her brother, Charlie W. Grewe. Within about two years, Auntie's sister-in-law died, but Auntie continued in the home. Charlie and Mrs. Grewe had three children. The appellant, Robert Grewe, was the youngest, he being just a few weeks of age at the time of his mother's death. About the same time the wife of William H. W. Grewe deceased and within a short period he, William, took up his home in the household of Charlie. For several years the parties lived together in Versailles, but later moved to William's 80 acre farm, that being the same premises in question in this litigation. Continuously during the lifetime of William, the household consisted of William, Charlie, Auntie and the appellant, Robert. During part of the time a daughter of Charlie and her husband also lived with them. Later Paul Swallow, a nephew of William, whose mother had died, was taken into the home. William and Charlie were brothers-in-law, and also first cousins. Auntie was a sister of Charlie and a first cousin of William.

Mrs. Mohrfield (Auntie) testifies that some time in 1928 or 1929 William handed to her the envelope with the deed enclosed, saying: "He says to keep that for Robert. After his death I should give that to Robert to be recorded."

Auntie further testifies that she kept the deed in her trunk, the trunk being located in a closet, entrance to which was from her bed room. That on two different occasions, at William's request, she went upstairs and got the deed from her trunk and brought the same downstairs so William might show to friends with whom he was talking that he had arranged his affairs so that Robert should have the farm. One of these occasions was when Mr. M. J. Wright, a relative from Dayton, had driven up to

make a little call. After taking the deed from the envelope and showing it to Mr. Wright, followed by some conversation between the two, the deed was again placed in the envelope and by William returned to Auntie with instructions to take it back and keep it so that she could deliver it to Robert at the end.

Mr. Wright was called as a witness and corroborates Auntie's testimony, giving the conversation in more detail.

At a later time, Reverend Wayne Willmann was at the home talking with William about some church matters. Reverend Willmann was the pastor of the church attended by William and other members of this household. On one of these visits, William asked Auntie to get the deed so that he might show the Reverend what he had done about his property. She again went upstairs, procured the package from her trunk, brought it down and handed it to William. He took same out of the envelope and handed it to the Reverend to read.

Reverend Willmann corroborated the testimony of Auntie, likewise giving more detail of the circumstances.

Other than these two occasions the deed remained in the trunk in Auntie's possession continuously from the time it was first given to her until some time in 1936, when, according to the testimony of Auntie, it was given to William to be placed in his safety deposit box for her. Shortly prior to this incident, William, who was a constant, or periodical drinker, drove his automobile into the garage when the car was on fire. It smoked up the garage considerably but the building did not take fire. Following this incident Auntie said she was afraid to keep the deed in the house on account of the hazards of a fire. A few years previous there had been a near fire from an overheated chimney. She mentioned this worry to William and suggested that since he had a safety deposit box in the Farmers National Bank in Greenville, why couldn't he place the deed and envelope in this safety deposit box for her. She inquired if that would not be all right. His answer was that he didn't know but

he would find out. Later, on a return from Greenville, he told her that he had inquired and that they told him it would be all right. Thereafter she gave him the deed enclosed in the envelope, and Paul Swallow drove him to town in William's car. At this particular time William's driver's license was taken from him because of his excessive drinking.

Paul Swallow testifies that he drove the car for William and that on the way in to Greenville William told him that he wanted to go to the Farmers National Bank, and at the same time showed him the deed. When he arrived at Greenville, he drove in front of the bank and parked there while William went in.

On the death of William, January 1937, the deed, enclosed in the envelope, was found in the safety deposit box of William in the Farmers National Bank.

Following the death of William, Robert called on two uncles, now adversaries in this proceeding, to go with him to the Farmers National Bank in Greenville, for the purpose of procuring the deed out of the safety deposit box. Robert had a key which was supposedly given to him by William before his death, and when they arrived at the bank they then discovered that he did not have the right key. The parties returned to the farm and in a trunk belonging to William, they found a purse and the key to the deposit box therein.

When the safety deposit box was opened the administrator of the estate was present, taking charge of the deed and has had it in his possession ever since.

The record testimony comprises some 340 pages, together with numerous exhibits. We have read this evidence in its entirety. We think we are safe in saying that 300 pages of the testimony could be deleted without taking anything of substance bearing upon the issuable question. No part of the testimony heretofore referred to is directly denied and this would necessarily follow since practically all the claimed conversations and incidents were not in the presence of any other person

than those heretofore mentioned.

Appellees' testimony is almost entirely confined to claimed quarrels and differences between William and Charlie, through which it is argued that the home relation was not always friendly and from this seeking to raise the inference that it was improbable that William would make disposition of his property and delivery of the deed as claimed. No evidence is presented as to any unfriendly relation between William and Auntie, and very little, if any, as between William and Robert.

One witness called by appellees gave testimony that William told him not so long before his death hat he had provided for disposition of his property, but that it didn't suit him and he was going to change it.

One of the first principles of law raised by counsel for appellees to which we will direct our attention was that Auntie was not legally capable of being the escrow agent.

It is a requisite that the escrow agent be a stranger to the deed; by stranger we mean a person not a party to the deed.

Counsel for appellees in support of their contention cite the case of Gross v List, 15 C. C., N. S. 113. An examination of this case discloses that the deed in question conveyed a life estate to the wife and the remainder to certain children and then placed the deed in the wife's hands to be delivered after his death. It was held by the Circuit Court that the placing of the deed in the hands of the wife would not constitute an escrow delivery. We are in accord with this principle, since the wife was not a stranger to the deed. In other words, she was one of the grantees.

It is our determination that Mrs. Mohrfield (Auntie) under the facts in the instant case would be a proper person to act as escrow agent.

The second question raised is that the deed being found in the safety deposit box of the grantor. adequately denies the claim of delivery in escrow.

We determine that this fact raises a presumption of non-delivery, out such presumption is not conclusive. 8 R. C. L., 999.

The third propostion presented by counsel for appellees is that the evidence fails to show that the grantor at any time parted with all control over the deed, but on the contrary that grantor did in fact retain dominion over the deed in question.

The principle of law controlling is very acceptably set forth in Volume 10, Ruling Case Law, Sec. 8, page 626, as follows:

"Where the possession of the depositary is subject to the control of the depositor, an instrument can not be said to be delivered, and it is not an escrow. While as will be seen, the depositor's right of possession may return if the specified event does not happen, or the conditions imposed are not performed, yet to constitute an instrument an escrow it is essential that the deposit of it should be in the meantime irrevocable; that is, that when the instrument is placed in the hands of the depositary, it should be intended to pass beyond the control of the depositor and that he should actually part with all present or temporary right of possession and control over it."

Also in 8 Ruling Case Law, page 999:

"But if the deed is not delivered, and is held by the custodian subject to the order of the grantor, who does not part with all control over it, retaining the right to reclaim or recall it, the transaction will usually be construed as an attempted testamentary disposition, which can be effected only by an instrument in writing executed in conformity with the statute of wills."

Counsel for appellees cite the evidence heretofore referred to as supporting their claim that William, the grantor, did not part with all control over the deed, but retained the right to reclaim or recall it.

Let us examine these instances, three in number.

The first two, similar in character, were the occasions when William re-

quested Auntie to get the deed so that he might show it, on the one occasion to Mr. Wright and on the other to Reverend Willmann, what disposition he had made of his property. Auntie, in her testimony, also stated that whenever William requested her to procure the deed, that she did so, but other than the two occasions mentioned no request was ever made, nor did she ever deliver the deed to him except on the third occasion, at her request, he took it to the bank to be deposited in the safety deposit box for her.

We are not able to conclude that the three incidents, either separately or in combination, taken in connection with all the other evidence, should be properly construed as a retention of control by the grantor, William.

Incidents Nos. 1 and 2, the evidence concerning which was presented by appellees, was in no sense an attempt to reclaim or recall the deed of conveyance, nor to take away from Auntie the control that had been given to her as escrow agent. We think this evidence argues the directly opposite conclusion. In both instances, he wanted his visitor (Mr. Wright first and Reverend Willmann, second) to know that he had made disposition of his property and that Auntie had possession of the deed to be delivered to Robert after William's death. Futhermore, it must be kept in mind that the ultimate question to be determined is whether or not if William delivered the deed to Auntie in the first instance, it was of such a character to constitute delivery in escrow. If so, William, the grantor, thereafter would be powerless to do anything to abrogate his act or set aside the deed.

At page 65 of the record appears the testimony of Auntie as to what William said to her when he first delivered the deed to her. "He says keep that for Robert. After his death I should give that to Robert to be recorded."

This, in connection with the notation on the envelope in which the deed was kept, presents adequate evidence of William's intention at the time he first made delivery to her.

It is highly probable that neither William nor Auntie understood fully the significance of an escrow delivery. We probably would be safe in saying that no layman does, unless he or she has been specially instructed. Mr. George A. Katzenberger, the lawyer and scrivener, says he fully informed William about the subject of delivery. The notation on the envelope is corroborative. The fact that William delivered it to Auntie at all, in connection with other evidence in the case, is very strong supporting testimony of his intention.

It also argues strongly that his attorney, Mr. Katzenberger, had adequately impressed upon him the necessity of an escrow delivery. If he had not understood this requirement and intended to comply with it, why would this single instrument be placed in the possession of Auntie? He had his original deeds to the farm and other valuable papers which he kept in his own trunk in his bed room in the home. He also had a safety deposit box wherein valuable papers might properly be kept.

The incident relative to the placing of the deed in the safety deposit box, while evidential on the question of non-delivery, is not conclusive. The other testimony, if it is to be believed, adequately removes the deduction.

Again we refer to the principle which must always be kept in mind, that a delivery in escrow once made may not be set aside or abrogated by any act of the grantor of the escrow. To be sure, it was an unwise thing for William to take the deed and place it in the bank, but the evidence gleans the conclusion that neither he nor Auntie thought that this would affect the validity.

In support of this conclusion we have the testimony of Auntie that it was her suggestion occasioned by the fact that a fear of fire had arisen in her mind, due to the automobile being on fire in the garage which was located about five feet from the house. Counsel for appellees question her attitude for the reason that the garage was of cement and the building itself was not on fire. The roof of the garage was of shingle.

We think it goes without saying that a burning automobile inside of a cement garage with a shingle roof, withing five feet of the residence, was a hazard.

According to the testimony, it was not William who called for the deed in order to place it in the safety deposit box, but the testimony of Auntie is corroborated by two other witnesses by statements made to them by William. According to Auntie, William told her that he didn't know whether it would be all right or not, but that he would find out. Reverend Willmann testifies that William told him that Auntie was afraid to keep the deed any longer because of the possibility of fire, and then asked the Reverend if he wouldn't keep it with his papers. The Reverend declined this request. Then William asked him if it would be all right to put it in his safety deposit box. The Reverend says he told him he thought that would be just the proper place to have it.

The boy Paul Swallow, a nephew of William, who at the time was making his home in this household, drove William's car in to Greenville. He says that on the way in William pulled the deed out of the envelope and said: "Here is this deed. I am going to take it down and put in my lock box for Auntie to keep for Robert."

Without making direct reference to the Ohio authorities, we refer to **O. Jur. Vol. 16**, under title "Escrows", page 361 et seq., and from **Sec. 1 to Sec. 22**, inclusive.

The editor has built his text from the Ohio authorities and it covers every phase of the question.

Counsel for appellants has referred us to American Jurisprudence, Volume 16, Sections 127, 129, 130, 131, 143 and 196. We have examined these sections as well as intervening sections. We find the cited sections in point and supporting our conclusions.

Other cited cases are as follows:

Johnson v Darling, **32 Oh Ap 113-120**;
Ball v Forman, **27 Oh St 132-139**;
Wheelwright v Wheelwright, 2 Mass. Reports, 446-452;

Hathaway v Payne, 34 N. Y., 92-106;
**Black v White, 33 Oh St 203.**

We are constrained to the view that the deed in question is a legal instrument, properly delivered, and that the title to the 80 acre tract is in the appellant, Robert Grewe, and that his title should be quieted. The prayer of the petition is allowed. Costs are adjudged against the appellees.

HORNBECK, PJ. & GEIGER, J, concur.

### APPLICATION FOR REHEARING

Decided June 7, 1939

BY THE COURT:

The above entitled cause is now being determined on appellee's application for rehearing on three grounds separately set out:

FIRST SPECIFICATION:

"1. The court, in arriving at its decision, did not take into consideration or dispose of the question raised by the plaintiff-appellee in the Common Pleas Court, namely, that the deed in question was delivered under the condition that Robert Grewe should remain on the farm and farm it until the death of William Grewe. The evidence in the case is clear that Robert Grewe did not comply with the condition of the deed."

We possibly overlooked mentioning this claim of counsel, but the same was considered and we determined it of no moment.

Considering the evidence as a whole, we would be unable to find that this was one of the conditions under which the deed was made to Robert Grewe. On this question nothing more could be said than that the grantor may have had in mind that Robert would become interested in the farm and remain thereon. However, as heretofore stated, this was not a condition of the delivery.

SECOND SPECIFICATION:

"2. The evidence in this case clearly shows that William Grewe, the decedent, at all times retained control over the deed in question."

The complete answer to this specification is that we determined otherwise

544

in our original opinion. Nothing further is required to be said.

THIRD SPECIFICATION:

"3. Inasmuch as the intention of the deed is an important element in this case, the testimony of witnesses who talked with William Grewe at the time they were threshing when the decedent said 'Deeds in a lock box were no good', should be considered carefully by the court."

We did not overlook this particular piece of evidence, but considered it of little moment.

It is just as inferable that William Grewe was trying to draw out from these witnesses their opinion as to whether or not the deed in the lock box would or would not be good, as it is that he was making a definitely determined announcement that such a deed would be no good. Other evidence in the record is supporting the conclusion that William Grewe through the deed deposited in the safety box for his sister, did not take away the effectiveness of his previous delivery in escrow.

The application for rehearing will be denied.

In the same mail we received motion requesting the court to make special findings of fact and conclusions of law.

We call attention to Rule 9 of the Rules of Practice of the Courts of Appeals of Ohio, as found in the front pages of Volume 50 Ohio Appeals Reports. Under this rule it is required that the party requesting a finding of fact shall prepare and submit the same to opposite counsel, within five days after the opinion is announced, unless further time be given by the court.

This rule not having been complied with the application for ██ special finding of fact will be overruled.

HORNBECK, PJ., GEIGER & BARNES, JJ, concur.